## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **DIANA M. HAJJAR** | ) | |
| **1501 Crystal Drive, Apt. 431** | ) | |
| **Arlington, VA 22202** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LONNIE BUNCH, Secretary,** | ) | **Civil Action No. _____** |
| **SMITHSONIAN INSTITUTION,** | ) | |
| **1000 Jefferson Dr. SW,** | ) | **JURY TRIAL DEMANDED** |
| **Washington DC 20560-0012** | ) | |
| | ) | |
| *Serve***:** | ) | |
| | ) | |
| **JESSIE K. LIU, U.S. ATTORNEY FOR** | ) | |
| **THE DISTRICT OF COLUMBIA** | ) | |
| **United States Attorney's Office** | ) | |
| **555 4th St. NW,** | ) | |
| **Washington, DC 20530** | ) | |
| *Via U.S.P.S. Certified Mail* | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WILLIAM BARR** | ) | |
| **ATTORNEY GENERAL** | ) | |
| **U.S. Department of Justice** | ) | |
| **950 Pennsylvania Avenue, N.W.** | ) | |
| **Washington, D.C. 20530-0001** | ) | |
| | ) | |
| *Defendant***.** | ) | |

_____)

## COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Diana Hajjar ("Hajjar"), by and through counsel, files this civil complaint and demand for jury trial against the Smithsonian Institution ("Smithsonian") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*., ("Title VII") for violations of discrimination based on national origin, race, sex, and retaliation for prior protected activity.

## INTRODUCTION

1.     Plaintiff is a 46-year-old Hispanic female born in Colombia, South America.

2.     Plaintiff was employed at the Smithsonian Institution, National Museum of the American Indian ("NMAI") on two separate occasions, from 2007 through 2011 in the Office of Visitor Services, and again from 2014 through January 2017 as a Museum Specialist.

3.     After Plaintiff left the Smithsonian in 2011, all records of her employment were deleted. In response to inquiries from potential employers, the Smithsonian stated that Plaintiff never worked there.

4.     Throughout Plaintiff's employment from 2007 through 2017, Plaintiff was subjected to discriminatory remarks, unequal treatment, accusations of theft, threats of physical harm, disparate pay, and anonymous notes warning Plaintiff that she was unwelcome at the Smithsonian.

5.     In November 2016, Plaintiff filed an informal EEO complaint alleging hostile work environment, discrimination, and retaliation.

6.     In December 2016, Plaintiff's appointment was prematurely terminated when she received an email stating that her appointment was to end in January 2017, rather than January 2018, and access to her email and work files was denied.

7.     As described more fully herein, Plaintiff brings the instant action against the Smithsonian for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*.,

## JURISIDCTION AND VENUE

8.     This Court has jurisdiction over this action generally pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically 42 U.S.C. § 2000(e), *et seq.*

9.     Hajjar timely initiated contact with the Smithsonian Office of Equal Employment and Minority Affairs ("EEO") regarding her claims on November 2, 2016.

10.     After receiving a Notice of Right to File on January 9, 2017, Hajjar filed a timely complaint of discrimination with the Smithsonian EEO office on February 2, 2017.

11.     More than one hundred eighty (180) days have passed since Hajjar filed her formal complaint.  Pursuant to 29 C.F.R. § 1614.407(b) and 42 U.S.C. § 2000(e)-16(c), this Honorable Court has jurisdiction over the matters described herein as Hajjar exhausted her administrative remedies.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b) because all or a substantial portion of the unlawful employment practices occurred within this judicial district.

## PARTIES

13.     Hajjar is a Latin American female, born in Colombia, and has lived in the United States since 2002.

14.     Hajjar is a resident of Arlington, Virginia, and worked at the Smithsonian from in or around 2007 through 2011, and again from 2014 until January 2017, and worked both as an independent contractor and employee in Visitor Services and as a Museum Specialist.

15.     The Smithsonian Institution is an independent agency of the federal government headquartered in the District of Columbia.

## FACTUAL ALLEGATIONS

### Hajjar's First Experiences of Discrimination at the Smithsonian

16.     In 2007, Hajjar began working for the Smithsonian's National Museum of the American Indian ("NMAI") in the Office of Visitor Services until 2011.

17.     For Visitor Services, Hajjar's role was to conduct outreach to Latin American communities, develop children's books with Native American illustrators, receive visiting groups and dignitaries, operate the theatre, and assist with family activities with interpretation and translation needs.

18.     From 2007 through 2011, Hajjar was subject to harassment from her colleagues at NMAI.

19.     In or around Fall 2008, Hajjar had a meeting with Shirley Cloud-Lane, the Visitors' Services Supervisor and Plaintiff's supervisor at the time. After the meeting, Visitor Services Assistants Katie Beckham and Kristen Shelton physically cornered Hajjar against a wall and would not release Hajjar until she disclosed her communications with Cloud-Lane.

20.     In or around May 2008, Visitor Services Assistants Beckham and Shelton as well as other individuals in various departments frequently asked Ms. Hajjar, "So, when are you going to return to Colombia?"

21.     In or around May 2008, Visitor Services Assistant Beckham regularly asked Hajjar, "So, are you thinking of quitting soon?," and ,"Are you considering going back to your own field and practicing as a Speech Pathologist in this country?" In or around May 2008,

Beckham said to Hajjar, "You, Diana Marcela, will never move from this place, you will never rise above Visitors' Services."

22.     In or around August 2008, Susan Cameron, Hajjar's then immediate supervisor, told Hajjar she should work at the National Zoo and stated, "You are on the wrong bus, and definitely in the wrong seat; I would be very pleased if you could find another job in a different place where you can use all your potential."

23.     In or around November 2008, Beckham commented to Hajjar, "It is good that you are invisible…and you should stay that way!"

24.     In or around November 19, 2008, when Hajjar was asked to greet the President of Bolivia in Spanish, Beckham criticized Hajjar that she should not because she was not a translator.

25.     On another occasion when Hajjar was asked to interpret for a group of visitors from Ecuador, Beckham and Shelton confronted Hajjar, claiming she was not an interpreter and did not have proper training.

26.     In or around January 2009, Beckham asked Hajjar, "Have you ever thought about quitting?  If you quit, you will have time to look for something better because you don't have any future here and they don't want you here."

27.     In or around May 2009, Beckham invited Hajjar to join a right-wing anti-immigration social group.

**Hajjar and Others Complain about the Discrimination Hajjar Received**

28.     In or around June 2009, without Hajjar's knowledge, two people anonymously reported to the Smithsonian's Office of Equal Employment and Minority Affairs that Hajjar was the subject of discrimination.

29.     In addition to the anonymous complaints on Hajjar's behalf, Hajjar wrote a formal letter on June 19, 2009, to the Smithsonian's Office of Equal Employment and Minority Affairs outlining the discriminatory events.

30.     On or around November 11, 2009, Hajjar followed up on her letter and subsequently submitted a formal letter to the EEO on or around November 24, 2009.

31.     In or around the Summer of 2009, Hajjar reported to her supervisor, Cameron, that she felt discriminated against by Beckham and Shelton.

32.     Cameron responded that Hajjar was the problem because Hajjar "could not speak English," "was not from here" [the United States], "could not read situations," and "did not understand the culture."

33.     Cameron added that Hajjar was the problem for the harassment.

34.     Cameron further stated that given her skills as a trained therapist, she was able to identify that Latina women are taught to accept being treated poorly and that Hajjar exhibited a "victim mentality" due to Hajjar's Latin American culture.

35.     Before his departure, in 2008, Scott Tucker, Manager of Visitor Services, stated to Beckham and Hajjar that he wished Hajjar had started working for him 'since the opening of the Museum.'

36.     Tucker stated that the Museum was planning on opening a Latin America Office and that he wanted to include Hajjar on the team.

37.     Beckham then stated, "You, Diana Marcela, will never move from this place, you will never rise above Visitor Services."

38.     In or around August 2009, after Hajjar disclosed to Cameron that the harassment was making her physically ill, Cameron responded, "That is understandable," and added that, in

the Latin American culture, "it is okay for women to be treated badly but it is not okay for you to get ill because of it."

39.     Also in or around August 2009, Cameron stated to Hajjar during her performance evaluation that she was in the wrong place and advised Hajjar to move to another team or museum.

40.     Cameron stated words to similar effect during each evaluation meeting with Hajjar, including during Hajjar's 2009 annual review and was also stated to the EEO office.

41.     In or around late 2009 or early 2010, Hajjar worked with a visitor, the wife of the former president of Peru. Hajjar communicated with the visitor in Spanish and then reach out to other colleagues to help respond to the visitor's questions. Cameron witnessed the interaction but because Hajjar did not introduce Cameron specifically, Cameron stated, "Oh! Poor me! I am now going to need to get two years of therapy because Diana Marcela is ignoring me and did not introduce me to the lady."

42.     In or around October 25, 2010, Hajjar emailed Kelli Cruz-Carter, the Administrative Management Specialist, and Machel Monenerkit, the Deputy Director, regarding continuous harassment from Katy Beckham and Kristen Shelton at the Resource Center from an event on October 20, 2010.

43.     At the event, both Beckham and Shelton were working at the Resource Center but remained at the Center beyond the completion of their events and were noticeably watching Hajjar, laughing, and making comments to one another.

**Despite Complaints of Discrimination, the Behavior Continued**

44.     In or around November 2009, after Hajjar explained to visitors where she was from, Cameron told Hajjar, "This is not acceptable. You cannot say that you are 'mestizo.' You

have to say that you are Indian. You look Indian. Your hair, your face, all your features are Indian. You need to say that you are Indian."

45.     Hajjar responded that she did not know what communities she is the product of.

46.     Cameron replied, "I don't care, you have to figure it out and pick one. There is no such thing as 'mestizo'…'mestizo' is nothing!  You need to choose a community or just make one up!"

47.     In early 2010, Cameron again accused Hajjar, "You are the problem since you come from a culture where women always see themselves as the victim…as a Latina, you take pride in being abused and treated poorly."

48.     In or around June 28, 2010, during a Visitor Services staff meeting, Cameron told Hajjar, "It might have been my intention to put you down. That really might have been my intent. If I am honest, I'll say that because that was my intent, just to make you feel like a creepy crawler. But, it could have been my intent was to clarify what was going on because I don't understand you. You have an accent and I don't understand anyone's accent; anybody who doesn't speak proper American, I just don't understand."

49.     During Summer 2010, Cameron held a meeting with all employees in the Visitor Services and stated she had "an activity" for the group.

50.     Cameron instructed the employees to form two circles and proceeded to explain that those individuals in the inner circle should say "something confrontational" to those in the outer circle.

51.     Cameron demonstrated how the exercise should be conducted by using Hajjar as an example and stating to Hajjar in front of the entire group, "You are Colombian, right?" "You

dress very nicely; is your dad a drug dealer?" "Do you use cocaine?" "Do you sell cocaine?" "Or do you do both?"

52.     Later that same day, Hajjar became dizzy and uncomfortable. Hajjar attempted to remove herself from Cameron's exercise; however, Beckham, Shelton, and Cameron followed Hajjar and cornered her against a wall.

53.     Hajjar became panicked and vomited.

54.     Thereafter, Hajjar called Research Specialist Cynthia Vidaurri to come look after Hajjar.

55.     Vidaurri and Hajjar went to Human Resources to report the incident, but Human Resources refused to intervene.  Hajjar then called her husband who came to the Museum and went to the fifth floor and spoke with HR and Cameron.

56.     On or around October 12, 2010, Hajjar was forced to work in the basement of the Mall museum and move heavy boxes.

57.     That same day, a box fell on Hajjar, injuring her left arm.

58.     In October 2010, Hajjar went to Monenerkit's office to ask her to be excused from a book review conducted by the Museum Director, Kevin Gover.

59.     In response to Hajjar's request, Monenerkit stated that Hajjar was the problem.

60.     Two months later, in December 2010, Hajjar was transferred to the Cultural Resource Center ("CRC") in Suitland, MD, where she was officially isolated.

61.     Hajjar also received warnings that she should not leave the CRC alone since there was the possibility that someone would harm her once she went out of the building.

62.     From that day onwards, José Montaño offered to drive Hajjar to a Metro Station in DC whenever Hajjar's husband could not come and pick her up.

63.     Shortly after being transferred to the CRC, Angelia Collins, the Cultural

Information Assistant and friend of Monenerkit and Cruz-Carter began harassing Hajjar.

64.     On at least two separate occasions, Collins approached Hajjar and stated, "You

are the problem! You should get out of here! That will be the best for the museum."

65.     On another occasion, during spring 2011, Collins stated, "You will never work

here! Even if Jose Barreiro and all the scholars want you here, you will never become an

employee! Even if they have the contract ready and everything is in order, the contract will never

be signed, and you will never work here!"

66.     Collins also used phrases such as, "We are going to eat you alive," and, "We will

destroy your life," toward Hajjar.

67.     Thereafter, in or around September 2011, Hajjar's contract with the Smithsonian

ended.

68.     After Hajjar's departure from NMAI in 2011, Hajjar's potential employers

complained to Hajjar that they were unable to complete a background review process for her

because NMAI stated that there was no record of Hajjar working there.

**Hajjar Works as A Contractor for José Barreiro**

69.     Hajjar was detailed to José Barreiro (Latin America) from 2009 through 2010

where she organized bibliographic and other files on the Indigenous Caribbean Project and

advanced Spanish-English-Spanish translations on the Ancient Peoples/Modern Migrations

Project. She also served as editor for all Spanish documents and future publications.

70.     In or around February 2014, Barreiro hired Hajjar as a contractor to assist with

*Caribbean Indigenous Legacy Project (CILP)* and, during that period, Ramiro Matos started

sending Hajjar additional work related to *The Great Inka Road: Engineering an Empire*.

10

71.     A few months later, in or around summer of 2014, Hajjar was asked whether she would be interested in coming back to work for Barreiro at the NMAI as a researcher and supporting the exhibit, *The Great Inka Road: Engineering an Empire*, under the direction of Ramiro Matos.

72.     Hajjar was to work as a bilingual Museum Specialist.

73.     During February 2014, Matos sent Hajjar some *Inka Road* documents to edit which, to his surprise and delight, Hajjar completed in a single night working until 3:00 AM.

74.     When Matos saw Hajjar's dedication, interest, and the quality of the work that she did for him, he approached Hajjar directly in or around summer 2014 and asked her questions along the lines, "What is the problem with you and your situation?," "What did you do?," "Why do they hate you so much?," "even at the Castle they refer to you as a problem."

75.     Hajjar and Matos spoke about Hajjar's previous EEO complaint and how it had shed light on the unlawful activities undertaken by Monenerkit and her group and demonstrated top NMAI management's refusal to address the situation and even tacit approval of such activity.

76.     Given the quality of Hajjar's work and her potential contribution to the *Inka Road* team, Matos wanted to pursue hiring Hajjar, so she encouraged him to speak with Supervisory Museum Curator Ann McMullen for further evidence or examples of her work ethic, dedication, and quality work product.

77.     Matos specifically warned Hajjar, in summer 2014, "Be careful, sometimes they can put a mark in your record and that will damage all your future job searches!"

78.     Matos further explained to Hajjar that Monenerkit sought to block Hajjar being rehired by offering Matos four (4) or five (5) personal assistants to work with him directly. All

he had to do to secure those additional personal assistants was to stop supporting the effort to hire Hajjar.

## Hajjar Receives A Term Appointment as a Smithsonian Employee

79.     It took months to get Hajjar's paperwork finalized and processed.

80.     During that time, Van Allen told RoseMaria Estévez, Program Specialist, that "she [Van Allen] wanted to be no part of all of that [bringing Hajjar back to the NMAI]."

81.     In addition, Matos shared with Hajjar that Van Allen told him that "the Cultural Interpreters were supposed to be responsible for destroying her [Hajjar's] career;" namely Sharyl Pahe, Supervisory Interpretive Services Specialist; Mandy Foster, Cultural Interpreter Coordinator; and Adrian Smith, IAC Coordinator, all under the direct supervision of Monenerkit; Van Allen; and Carolyn Rapkievian, Assistant Director for Education and Museum Programs.

82.     When Hajjar responded to Matos, "I should have sued them then," his response was, "No one wants to sue the Smithsonian … you cannot win," which reminded Hajjar of Cameron's earlier threat from 2010, "Go ahead, go ahead and sue us. I have been in this situation before and we know exactly how to deal with employees like you and how to handle such complaints."  Cameron was very clear that she had experience with such situations and was well versed in how to turn things around.

83.     On or about September 23, 2014, prior to Hajjar receiving her term appointment, Monenerkit requested a meeting with Hajjar to discuss Monenerkit's concerns with Hajjar returning to NMAI after previously filing an EEO complaint and threatening to sue the Smithsonian.

84.     At the meeting, Monenerkit stated to Hajjar that "I [Monenerkit] am the person who runs the museum" and that Hajjar's position was for one year only, after which she did not want to see Hajjar at the museum.

85.     After the September 23, 2014, meeting with Hajjar, Monenerkit discussed her concerns regarding Hajjar's return to NMAI with NMAI Director Kevin Gover.

86.     Finally, on or around December 8, 2014, Hajjar received a term appointment as a Museum Specialist for one year, from January 12, 2015 to January 11, 2016, but due to the immediate need for assistance on the *Inka Road* exhibit, the Smithsonian acquired gap funding and Hajjar returned to NMAI in early December 2014.

87.     In Spring 2015, Hajjar met with Gover as part of the onboarding process.

88.     At the meeting, Gover asked what kind of employee Hajjar was and Hajjar responded that she was a Trust employee with a one-year term.

89.     Gover responded that he hoped Hajjar would leave after her one-year term expired.

90.     At the meeting, Hajjar also mentioned the possibility of integrating Latin American communities into certain exhibits, to which Gover replied, "I don't care about Latin America."

### Sex Discrimination by Ramiro Matos

91.     During Hajjar's work on *Inka Road*, while José Barreiro was assigned as Hajjar's official supervisor, Hajjar's project manager was the lead curator of *Inka Road* project, Ramiro Matos.

92.     Matos had a reputation for mistreating female assistants and for misconduct with female subordinates.

93.     Throughout the period Hajjar worked with Matos on *Inka Road*, from December 2014 to August 2015, Matos humiliated and belittled Hajjar by treating her as his personal administrative assistant rather than an academic researcher and Museum Specialist.

94.     On numerous occasions, including events at Dumbarton Oaks, Embassies of countries participating in the *Inka Road* exhibit, the Organization of American States ("OAS"), the Federal Bureau of Investigation ("FBI"), The George Washington University Museum, as well as with a large number of acclaimed researchers and professors in her field, Matos regularly introduced Hajjar as his personal researcher or his personal assistant.

95.     Throughout Hajjar's time working with Matos, Matos demonstrated disregard for Hajjar's time, such as calling Hajjar at her home early on the weekends, holidays, and during leave time.

96.     In Spring 2015, Hajjar took leave to fly to Colombia to care for her terminally ill mother.

97.     During this time, Matos contacted Hajjar demanding information regarding work related projects.

98.     On numerous occasions in 2014 and 2015, Matos asked Hajjar about her previous complaints and participation with the EEO office.

99.     In June 2015, at the symposium for the opening of the *Inka Road* Exhibition that the NMAI hosted at the Mall, Matos introduced Hajjar as his personal assistant in front of a group of international researchers.

100.    In front of the group of scholars, including Christian Vitry, whom Hajjar had never met before, Matos stated that Hajjar was "deeply in love" with Vitry and repeatedly referred to Vitry as Ms. Hajjar's "boyfriend" and "the one that you [Hajjar] are in love with."

101.    On or around July 23, 2015, a month after the *Inka Road* exhibit opened, Matos and Hajjar submitted a proposal for funding to conduct a study on visitors to the exhibit.

102.    The proposal was subsequently denied, and Matos told Hajjar that it was denied because it had her name on it.

103.    A few months later, a substantially similar study was conducted after Carolyn Rapkievian was supported/funded for that proposal.

104.    In or around August 2015, Matos stated to Nancy Kenet Vickery, CS Program Specialist, that Hajjar was being moved from his project because Hajjar was stealing information from his computer and files.

105.    In summer 2015, Hajjar was assigned the task of archiving all materials for the *Inka Road* exhibit.

106.    In order to complete this task, Hajjar had to either request that Matos send Hajjar a folder with all of his files or access Matos's computer to obtain the files herself.

107.    Matos refused to work with Hajjar on the archiving project and stated, "I have a lot of information on my computer and you are very intelligent. If I let you access the information, in two years you will be publishing your own articles with my information."

108.    In or about August 2015, after Hajjar notified Barreiro of these incidences of harassment and Matos's accusations that Hajjar stole information from his computer and files, Barreiro and Estévez attempted to remove Hajjar from certain positions or tasks in order to reduce her exposure to Matos.

109.    At this time, Barreiro also notified David Penney, Associate Director of Museum Scholarship at NMAI, and Kevin Cramer, Supervisory Management and Program Analyst, of the harassment as well.

110.    This resulted in further retaliatory conduct by Matos.

111.    From this time forward, Matos lead various scholars to believe that Hajjar was his personal assistant or secretary, rather than her true title and role as Museum Specialist or project assistant.

112.    Throughout 2016, during each encounter Hajjar had with Matos, Matos would make statements that Hajjar was just a secretary or that Hajjar was "a secretary's secretary," referring to Estévez.

113.    In or around fall 2015, Matos stated to Hajjar, "As soon as you start working at the Mall, you will only be seen as a secretary. You can forget about your career forget about *Guáman Poma* [a previous dissertation topic for Hajjar's Ph.D. thesis]."

114.    In or around February 2016, Matos stated to Hajjar that she should not tell people that she was in the process of getting her Ph.D. because "no one would believe you could reach that level" and reiterated that "many people believe that you were only hired to be a secretary."

115.    That same month, Hajjar reported Matos's statements to Barreiro and Estévez.

116.    Barreiro encouraged Hajjar to change the topic of her dissertation based on Matos's statements and unfounded accusations of her stealing his work.

117.    Hajjar had been working on the *Guáman Poma* dissertation topic since 2010.

118.    Based on Matos's threats, Hajjar has experienced numerous delays in completing her degree and has been reticent to try and publish any materials, especially in light of Matos's accusations and his reputation of how he treated previous employees and destroyed their reputations.

119.    On or around August 2016, Hajjar changed her dissertation topic to *Heroes and Heroines During the Colonial Period: Cortes and Pizarro in juxtaposition to Erauso, Sisa, Azurduy and Sáenz.*

120.    In or around September 2016, during one of the NMAI scholars' regular meetings, a scholar, Antonio Curet, approached Hajjar and asked about her role at NMAI because Matos led him to believe that Hajjar was his personal assistant or secretary and not part of the professional staff.

121.    In or around September 2016, Matos conveyed to the Curatorial Department staff, including Cecile Ganteaume, that Hajjar was Estévez's secretary hired to do administrative work rather than academic work.

122.    On or around September 30, 2016, Estévez had to send out an email to members of the Scholarship Division in order to make it clear that Hajjar did not report to her.

123.    On or around October 5, 2016, during a teleconference regarding the archiving of *Inka Road*, Matos demeaned and defamed Hajjar as he was unaware Hajjar was on the call.

124.    From 2014 through January 2017, Hajjar was paid less than other Museum Specialists doing substantially similar work, such as Cecile Ganteaume (American), Rachel Goddard Griffin (American), Maria Galban (American), Joe Horse Capture (Male, Native American), Emil Her Many Horses (Male, Native American), Kathleen Ash-Milby (American), Rebecca Trautmann (American) and Dennis Zotigh (Male, Native American), and contractor Jessica Phippen (American).

125.    Additionally, from 2014 through January 2017, Hajjar was not promoted at the same rate as her peers such as Martin Earring, the Special Assistant to the Deputy Director, and Mandy Foster, the Cultural Interpreter Coordinator.

**Hajjar is Removed from Other Projects**

126.    In addition to *Inka Road*, NMAI assigned Hajjar work on other projects, including *Caribbean Indigenous Legacy Project* ("*CILP*" or "*Taíno*"), *Contact*, and the *Queros* book.

127.    However, from in or around March 2016 through November 2016, Hajjar was removed from regular email communications and was excluded from various exhibit project teams, such as *CILP* and *Contact*.

128.    From in or around March 2016 through November 2016, Hajjar was removed from regular email communications and was excluded from the *Native New York* exhibit project team.

129.    On or around December 25, 2016, Hajjar was unable to access her personnel records, including after Hajjar notified HR requesting copies of her performance evaluations.

**Hajjar Receives Further Incidents of Harassment**

130.    On or around September 18, 2016, during a weekend festival that NMAI hosted, Estévez found an envelope on her desk with Hajjar's name on it.

131.    The following day, Hajjar discovered that the envelope contained an anonymous note addressed to Hajjar.

132.    It reads as follows and references Hajjar's prior EEO complaint from 2009:

> From the very beginning, when you began to work in the museum in visitor services your attitude has been a problem, for almost everyone. You do not fit in with this institution and you shouldn't be here anymore. Your presence creates uncomfortable feelings in the building. Your energy is negative, and you should realize that this is your problem. It's time for you to look for another place to work, this would be beneficial for the personnel of the museum and this would benefit you too. Don't waste your time, make it as soon as possible.

133.    Hajjar immediately reported the note to Barreiro, who reported the incident to Kevin Cramer in Human Resources.

134.    On or around September 19, 2016, Barreiro met with Cramer and delivered the original note. Barreiro asked that Cramer investigate the situation.

135.    A few days later, Barreiro left on a work trip.

136.    Following Barreiro's departure, Cramer approached Hajjar and asked to meet about the note. Hajjar requested that the meeting be postponed to a later time so that Barreiro could be in attendance.

137.    On or around October 3, 2016, upon arriving to her workspace, Hajjar discovered that all of her computer components and cords had been unplugged and disconnected.

138.    Hajjar notified Estévez who contacted IT.

139.    The IT department confirmed that no work was conducted on Hajjar's computer and there was no administrative reason the cords should have been unplugged and/or the components disconnected.

140.    On or around October 4, 2016, the NMAI Director of Security confirmed that there were no working security cameras covering the area in question and that there was no footage of who may have left the note that was found on September 18, 2016.

141.    No one within NMAI management, such as Gover, Monenerkit, Penney, or Cramer, reviewed any actual video footage.

142.    While the floor where the September 18, 2016, note was left required electronic access through a keycard, no one within NMAI management or security reviewed access data to determine who accessed the floor during the time preceding the discovery of the note.

143.    On or around October 7, 2016, during the Dumbarton Oaks conference, Emily Kaplan, NMAI Conservator, stated to Hajjar that it would be better for Hajjar to work from home because she "could be poisoned."

19

144.    On or around October 14, 2016, Estévez spoke with Penney about the anonymous note to see whether there was any additional information about who may have left the note.

145.    During the meeting, Estévez made Penney aware that Hajjar was "considered a target."

146.    In response, Penney stated to Estévez that she should not discuss the note anymore.

147.    Other than confirmation that there were no cameras pointed in the vicinity of where the September 18, 2016, note was left, NMAI did nothing else to investigate or address the note, its author, or future preventative measures.

**Hajjar's Second EEO Complaint and Termination of Appointment**

148.    On or around November 2, 2016, Hajjar wrote to Shadella Davis, an EEO specialist familiar with Hajjar's 2009 complaint, to report discrimination based on race, sex, national origin, and reprisal.

149.    On or around November 3, 2016, Hajjar submitted an EEO counseling form along with a copy of the anonymous note and an outline of the hostile work environment and harassment Hajjar endured.

150.    Hajjar's informal complaint was assigned to EEO counselor Michelle Giordano and on December 14, 2016, a counseling session was held.

151.    On or about December 8, 2016, Estévez informed Hajjar that Kelli Cruz-Carter from Human Resources received several complaints regarding Hajjar's return to the NMAI.

152.    In response to these complaints, Cruz-Carter instructed that the individuals speak with Penney.

153.    On or around December 21, 2016, Hajjar requested leave for the rest of December and early January.

154.    That same day, Penney approved of Hajjar's leave request for December.

155.    On December 12, 2016, Penney emailed Hajjar regarding her performance plan for 2017.

156.    However, on or around December 21, 2016, Hajjar received an email from Barreiro containing a message from Cramer indicating that Hajjar's appointment was set to end on January 11, 2017, terminating Hajjar's employment.

157.    This came as a surprise to both Hajjar and Barreiro because prior to the one-year expiration of her term in January 2016, Barreiro requested an extension of Hajjar's appointment for two years, to January 2018.

158.    In fact, Barreiro requested that NMAI hire Hajjar as a permanent employee given her valuable and essential work as a Museum Specialist and translator.

159.    No one within NMAI management, such as Gover, Monenerkit, Penney, or Cramer, informed Hajjar or Barreiro that the two-year extension was not granted.

160.    At the time of the termination of her appointment, Hajjar was still working on the archiving of the *Inka Road* exhibition, providing Kaplan with editing and Spanish translations on the *Queros* book, building and organizing José Barreiro's lifetime work archive and was being brought back into the *Contact* exhibition work team.

161.    On or around December 21, 2016, Hajjar's access to her NMAI email and files was revoked despite her appointment remaining open at least until January 11, 2017.

162.    On or around December 23, 2016, Hajjar discovered a second anonymous note on her desk, and also noticed that her belongings in her workspace had been moved.

163.    The second anonymous note read, "Keep calm and remember Indians."

164.    On or around December 23, 2016, Hajjar wrote to Barreiro reminding him that she was about to depart for the winter holidays and to consider her correspondence her two weeks' notice, as it was clear Hajjar was already constructively discharged and no longer able to perform the essential duties of her job without email or network access.

165.    Furthermore, her return from approved leave would be 10 days before her appointment was to abruptly end.

166.    Following her termination, NMAI opened the *CILP* exhibition in Fall 2018.

## COUNT I

### Title VII
### 42 U.S.C. §2000e, *et seq*.
### Discrimination and Hostile Work Environment Based on National Origin

167.    Hajjar incorporates the allegations in the forgoing paragraphs as though alleged herein.

168.    Hajjar was an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

169.    The Smithsonian is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

170.    Hajjar was born in Colombia.

The Smithsonian violated 42 U.S.C. §2000e-2, *et seq*., by discriminating against Hajjar and creating a hostile work environment based on her national origin when it engaged in the following actions:

a.  On September 23, 2014, Hajjar had a meeting with Monenerkit, Deputy Director of NMAI, who advised her that her appointment was only (1) year and, after that she did not want Hajjar working at NMAI and she was not allowed to visit any of the buildings;

b.  In March 2015, Gover, Director of NMAI, told Hajjar in her rehire meeting that he hoped that she would be out after the one-year term appointment. Gover also said, in reply to Hajjar's suggestion of integrating Latin American communities into certain exhibits, "I don't care about Latin America;"

22

c.  On or about July 23, 2015, Matos told Hajjar that a proposal for funding to study visitors to the *Inka Road* exhibit was denied because it had Hajjar's name on it;

d.  Beginning in March 2016, Hajjar could no longer access her personnel records even after requesting copies from Human Resources, who failed to respond;

e.  In March 2016, Complainant's name was removed from some of the work she did on the exhibit *The Great Inka Road: Engineering an Empire*, such as educational publications and outreach materials;

f.  From March 2016 through November 2016, Hajjar was removed from many regular email communications and excluded from various exhibit project teams that she had been working with, including CILP, the *Native New York* team, and the *Contact* team;

g.  On September 19, 2016, Hajjar found a handwritten note on her desk informing her that she did not fit in with NMAI and telling her to look for another place to work;

h.  On October 3, 2016, Hajjar's computer was unplugged and its components disconnected;

i.  On October 7, 2016, during the Dumbarton Oaks conference, Emily Kaplan, NMAI Conservator, told Hajjar out of concern for her that it would be better to work from home because she "could be poisoned;"

j.  On October 24, 2015, Mandy Foster, NMAI Cultural Interpreter Coordinator, refused Hajjar's request to schedule an extended translated tour, although exceptions are regularly granted for such tours;

k.  On November 2, 2016, Carolyn Rapkievian, Assistant Director for Education and Museum Programs, emailed the Cultural Interpreter, Jose Montaño, and indicated there were four (4) different departments that Hajjar and the interpreter would need to work with to get proper approvals and documentation for the translated tour, which effectively made the tour impossible;

l.  On December 21, 2016, Hajjar's supervisor, Jose Barreiro, forwarded her an email from Kevin Cramer, Supervisory Management and Program Analyst, in which Cramer notified Barreiro that Hajjar's appointment was scheduled to end on January 11, 2017;

m.  On December 23, 2016, someone left a note on Hajjar's desk and moved her sweater; and

n.  On or about December 21, 2016, Hajjar was constructively discharged, prior to her scheduled appointment end date of January 11, 2017, when her access to her NMAI email account and NMAI files was revoked.

171.     The statements by Susan Cameron during Hajjar's first period of employment at NMAI and management's failure to address Cameron's actions, statements by Kevin Gover regarding Latin America, the disparate treatment Hajjar faced as compared to those with a different national origin, the handwritten note demanding Hajjar leave NMAI and NMAI management's failure to properly address the note, and unexplained termination of Hajjar's employment despite her supervisor's request for an extension, among other facts, demonstrate a causal link for the adverse actions and national origin discrimination.

172.     The Smithsonian cannot demonstrate a lack of funding or workload to justify a legitimate nondiscriminatory reason for Hajjar's termination and, therefore, the Smithsonian's actions constitute national origin discrimination.

173.     The Smithsonian's stated and forthcoming reasons for the denial of Hajjar's contract extension and subsequent forced resignation are pretextual.

174.     Hajjar sustained substantial monetary and non-monetary damages as the result of the Smithsonian Institution's illegal conduct.

175.     For the Smithsonian's unlawful discrimination, Hajjar is entitled to general and special damages, economic damages, including front and back pay, compensatory damages, reasonable attorney's fees, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

## COUNT II

### Title VII
### 42 U.S.C. §2000e, *et seq*.
### Discrimination and Hostile Work Environment Based on Race

176.     Hajjar incorporates the allegations in the forgoing paragraphs as though alleged herein.

177.    Hajjar is an "employee" as the term is defined in 42 U.S.C. § 2000e(f).

178.    The Smithsonian is an "employer" as the term is defined in 42 U.S.C. § 2000e(b).

179.    Hajjar is Hispanic and Latin American.

180.    The Smithsonian violated 42 U.S.C. § 2000e-2, *et seq*., by discriminating against

Hajjar and creating a hostile work environment based on her race when it engaged in the

following actions:

a.  On September 23, 2014, Hajjar had a meeting with Monenerkit, Deputy Director of NMAI, who advised her that her appointment was only (1) year and, after that she did not want Hajjar working at NMAI and she was not allowed to visit any of the buildings;

b.  In March 2015, Gover, Director of NMAI, told Hajjar in her rehire meeting that he hoped that she would be out after the one-year term appointment. Gover also said, in reply to Hajjar's suggestion of integrating Latin American communities into certain exhibits, "I don't care about Latin America;"

c.  On or about July 23, 015, Matos told Hajjar that a proposal for funding to study visitors to the *Inka Road* exhibit was denied because it had Hajjar's name on it;

d.  Beginning in March 2016, Hajjar could no longer access her personnel records even after requesting copies from Human Resources, who failed to respond;

e.  In March 2016, Complainant's name was removed from some of the work she did on the exhibit *The Great Inka Road: Engineering an Empire*, such as educational publications and outreach materials;

f.  From March 2016 through November 2016, Hajjar was removed from many regular email communications and excluded from various exhibit project teams that she had been working with, including CILP, the *Native New York* team, and the *Contact* team;

g.  On September 19, 2016, Hajjar found a handwritten note on her desk informing her that she did not fit in with NMAI and telling her to look for another place to work;

h.  On October 3, 2016, Hajjar's computer was unplugged and its components disconnected;

i.  On October 7, 2016, during the Dumbarton Oaks conference, Emily Kaplan, NMAI Conservator, told Hajjar out of concern from her that it would be better to work from home because she "could be poisoned;"

j. On October 24, 2015, Mandy Foster, NMAI Cultural Interpreter Coordinator, refused Hajjar's request to schedule an extended translated tour, although exceptions are regularly granted for such tours;

k. On November 2, 2016, Carolyn Rapkievian, Assistant Director for Education and Museum Programs, emailed the Cultural Interpreter, Jose Montaño, and indicated there were four (4) different departments that Hajjar and the interpreter would need to work with to get proper approvals and documentation for the translated tour, which effectively made the tour impossible;

l. On December 21, 2016, Hajjar's supervisor, Jose Barreiro, forwarded her an email from Kevin Cramer, Supervisory Management and Program Analyst, in which Cramer notified Barreiro that Hajjar's appointment was scheduled to end on January 11, 2017;

m. On December 23, 2016, someone left a note on Hajjar's desk and moved her sweater; and

n. On or about December 21, 2016, Hajjar was constructively discharged, prior to her scheduled appointment end date of January 11, 201, when her access to her NMAI email account and NMAI files was revoked.

181.    The statements by Susan Cameron during Hajjar's first period of employment at NMAI and management's failure to address Cameron's actions, statements by Kevin Gover regarding Latin America, the disparate treatment Hajjar faced as compared to those with a different race, the handwritten note demanding Hajjar leave NMAI and NMAI management's failure to properly address the note, and unexplained termination of Hajjar's employment despite her supervisor's request for an extension, among other facts, demonstrate a causal link for the adverse actions and race discrimination.

182.    The Smithsonian cannot demonstrate a lack of funding or workload to justify a legitimate nondiscriminatory reason for Hajjar's termination and, therefore, the Smithsonian's actions constitute race discrimination.

183.    The Smithsonian's stated and forthcoming reasons for treating Hajjar in a disparate manner are pretextual.

184.    Hajjar sustained substantial monetary and non-monetary damages as the result of the Smithsonian Institution's illegal conduct.

185.    For the Smithsonian's unlawful discrimination, Hajjar is entitled to general and special damages, economic damages, including front and back pay, compensatory damages, reasonable attorney's fees, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

## COUNT III

**Title VII**
**42 U.S.C. §2000e, *et seq*.**
**Discrimination and Hostile Work Environment Based on Sex**

186.    Hajjar incorporates the allegations in the forgoing paragraphs as though alleged herein.

187.    Hajjar was an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

188.    The Smithsonian is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

189.    Hajjar is female.

190.    The Smithsonian violated 42 U.S.C. § 2000e-2, *et seq*., by discriminating against Hajjar and creating a hostile work environment based on her sex when it engaged in the following actions:

    a.  From late 2014 through summer 2015, Hajjar worked with Matos, NMAI, Office of Latin America, Associate Curator. Matos questioned Hajjar about her previous EEO complaints and he told people she was his personal assistant or secretary;

    b.  In August 2015, Matos told Hajjar's colleague, Nancy Kenet Vickery, that Hajjar was stealing information from his computer and files;

    c.  In summer 2015, Matos refused to work with Hajjar on several projects, including on an archiving project for which he was the lead curator;

    d.  On or about July 23, 015, Matos told Hajjar that a proposal for funding to study visitors to the *Inka Road* exhibit was denied because it had Hajjar's name on it;

27

e.  In February 2016, Matos told Hajjar not to tell people she was getting her Ph.D. because "no one would believe you…";

f.  From March 2016 through November 2016, Hajjar was removed from many regular email communications and excluded from various exhibit project teams that she had been working with, including CILP, the *Native New York* team, and the *Contact* team;

g.  On October 5, 2016, Matos demeaned Hajjar and defamed her professional reputation during a tele-conference; and

h.  On October 7, 2016, during the Dumbarton Oaks conference, Emily Kaplan, NMAI Conservator, told Hajjar out of concern from her that it would be better to work from home because she "could be poisoned."

191.   The statements from Matos regarding Hajjar performing work as his personal assistant or secretary, instructing Hajjar not to disclose the fact that she was obtaining a Ph.D. because no one would believe her, among other facts, demonstrate sex-based stereotyping and a causal link between Hajjar's sex and the adverse actions.

192.   The Smithsonian's stated and forthcoming reasons for treating Hajjar in a disparate manner are pretextual.

193.   Hajjar sustained substantial monetary and non-monetary damages as the result of the Smithsonian Institution's illegal conduct.

194.   For the Smithsonian's unlawful discrimination, Hajjar is entitled to general and special damages, economic damages, including front and back pay, compensatory damages, reasonable attorney's fees, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

### COUNT IV

**Title VII**
**42 U.S.C. §2000e, *et seq*.**
**Retaliation and Hostile Work Environment Based on Protected Conduct**

195.     Hajjar incorporates the allegations in the forgoing paragraphs as though alleged

herein.

196.     Hajjar was an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

197.     The Smithsonian is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

198.     Hajjar engaged in protected activity when:

a.   On or around July 2009, Hajjar disclosed to Susan Cameron that she felt she was being discriminated against by Kathryn Beckham and Kristen Shelton;

b.   On June 19, 2009, Hajjar filed an EEO complaint with the Smithsonian EEO office;

c.   In or around June 2009, two colleagues anonymously reported to the Smithsonian's EEO office that Hajjar was the subject of discrimination;

d.   On June 19, 2009, Hajjar filed a formal letter with the Smithsonian EEO office;

e.   On November 24, 2009, Hajjar sent a second formal letter to the Smithsonian EEO office;

f.   In July 2009, Hajjar submitted several instances of hostility and harassment from Beckham and Shelton to Shadella Davis in the EEO office;

g.   On November 24, 2009, Ramiro Matos learned of Hajjar's prior EEO activity;

h.   On November 2, 2016, when Hajjar wrote to Shadella Davis, an EEO specialist, to report discrimination based on race, sex, national origin, and reprisal;

i.   On November 3, 2016, when Hajjar submitted an EEO counseling form to the Smithsonian EEO office; and

j.   On December 14, 2016, Hajjar attended a counseling session regarding her informal EEO complaint.

199.     The Smithsonian retaliated against Hajjar and created a hostile work environment

because of her protected conduct when it engaged in the following actions:

a.   On September 23, 2014, Hajjar had a meeting with Monenerkit, Deputy Director of NMAI, who advised her that her appointment was only (1) year and, after that she did not want Hajjar working at NMAI and she was not allowed to visit any of the buildings;

b. From late 2014 through summer 2015, Hajjar worked with Matos, NMAI, Office of Latin America, Associate Curator. Matos questioned Hajjar about her previous EEO complaints and he told people she was his personal assistant or secretary;

c. In March 2015, Gover, Director of NMAI, told Hajjar in her rehire meeting that he hoped that she would be out after the one-year term appointment. Gover also said, in reply to Hajjar's suggestion of integrating Latin American communities into certain exhibits, "I don't care about Latin America;"

d. In August 2015, Matos told Hajjar's colleague, Nancy Kenet Vickery, that Hajjar was stealing information from his computer and files;

e. In summer 2015, Matos refused to work with Hajjar on several projects, including on an archiving project for which he was the lead curator;

f. On or about July 23, 015, Matos told Hajjar that a proposal for funding to study visitors to the *Inka Road* exhibit was denied because it had Hajjar's name on it;

g. In February 2016, Matos told Hajjar not to tell people she was getting her Ph.D. because "no one would believe you…";

h. Beginning in March 2016, Hajjar could no longer access her personnel records even after requesting copies from Human Resources, who failed to respond;

i. In March 2016, Complainant's name was removed from some of the work she did on the exhibit *The Great Inka Road: Engineering an Empire*, such as educational publications and outreach materials;

j. From March 2016 through November 2016, Hajjar was removed from many regular email communications and excluded from various exhibit project teams that she had been working with, including CILP, the *Native New York* team, and the *Contact* team;

k. On September 19, 2016, Hajjar found a handwritten note on her desk informing her that she did not fit in with NMAI and telling her to look for another place to work;

l. On October 3, 2016, Hajjar's computer was unplugged and its components disconnected;

m. On October 5, 2016, Matos demeaned Hajjar and defamed her professional reputation during a tele-conference;

n. On October 7, 2016, during the Dumbarton Oaks conference, Emily Kaplan, NMAI Conservator, told Hajjar out of concern from her that it would be better to work from home because she "could be poisoned;"

o. On October 24, 2015, Mandy Foster, NMAI Cultural Interpreter Coordinator, refused Hajjar's request to schedule an extended translated tour, although exceptions are regularly granted for such tours;

p. On November 2, 2016, Carolyn Rapkievian, Assistant Director for Education and Museum Programs, emailed the Cultural Interpreter, Jose Montaño, and indicated there were four (4) different departments that Hajjar and the interpreter would need to work with to get proper approvals and documentation for the translated tour, which effectively made the tour impossible;

q. On December 21, 2016, Hajjar's supervisor, Jose Barreiro, forwarded her an email from Kevin Cramer, Supervisory Management and Program Analyst, in which Cramer notified Barreiro that Hajjar's appointment was scheduled to end on January 11, 2017;

r. On December 23, 2016, someone left a note on Hajjar's desk and moved her sweater; and

s. On or about December 21, 2016, Hajjar was constructively discharged, prior to her scheduled appointment end date of January 11, 2017, when her access to her NMAI email account and NMAI files was revoked.

200. Monenerkit's meetings with Hajjar and Gover to go over Hajjar's previous complaint against NMAI prior to Hajjar's return to in 2014, statements from Monenerkit and Gover that Hajjar would not be able to stay at NMAI from the onset of her employment in 2014, the disparate treatment Hajjar faced as compared to those who did not complain of discrimination or harassment, the handwritten note demanding Hajjar leave NMAI and NMAI management's failure to properly address the note, and unexplained termination of Hajjar's employment despite her supervisor's request for an extension, among other facts, demonstrate a hostile work environment and its causal link to discrimination and protected conduct.

201. The Smithsonian cannot demonstrate a lack of funding or workload to justify a legitimate nondiscriminatory reason for Hajjar's termination and, therefore, the Smithsonian's actions constitute retaliation.

202. The Smithsonian's stated and forthcoming reasons for treating Hajjar in a disparate manner are pretextual.

203.    Hajjar sustained substantial monetary and non-monetary damages as the result of the Smithsonian Institution's illegal conduct.

204.    For the Smithsonian's unlawful discrimination, Hajjar is entitled to general and special damages, economic damages, including front and back pay, compensatory damages, reasonable attorney's fees, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

## PRAYER FOR RELIEF

Based on the forgoing, Hajjar respectfully requests that she be awarded the following:

a.   Economic damages for lost compensation and damages to Hajjar's career;

b.   Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

c.   Reasonable costs and experts' and attorney's fees; and

d.   Any other such relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Hajjar requests a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,


/s/  Michael L. Vogelsang, Jr.
R. Scott Oswald, Esq.
Michael L. Vogelsang, Jr.
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2818
(202) 261-2835 (facsimile)
mvogelsang@employmentlawgroup.com
*Counsel for Hajjar*